# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BRAGA INVESTMENT & ADVISORY, LLC, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 2017-0393-AGB |
| YENNI INCOME OPPORTUNITIES FUND I, L.P., | ) ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: April 9, 2020
Date Decided: June 8, 2020

Blake Rohrbacher and Kevin M. Regan, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; David Lackowitz and Alexandra Kolod, MOSES & SINGER LLP, New York, New York; *Attorneys for Plaintiff Braga Investment & Advisory, LLC*.

Julia B. Klein, KLEIN LLC, Wilmington, Delaware; Justin S. Stern, FRIGON MAHER & STERN LLP, New York, New York; *Attorneys for Defendant Yenni Income Opportunities Fund I, L.P.*

**BOUCHARD, C**

This post-trial opinion resolves a contractual dispute arising from an investment Braga Investment & Advisory, LLC ("Braga") made to acquire 23.3% of the membership interests of Steven Feller, P.E., LLC ("Newco") as part of a transaction in which Newco acquired the business of Steven Feller P.E., PL ("Oldco"). Yenni Income Opportunities Fund I, L.P. ("the Fund"), a private equity investment firm, put the transaction together and ultimately became the Managing Investor of Newco. The transaction closed in September 2016.

The trial concerned claims under two different contracts: (i) a purchase agreement among the Fund, Oldco, and Oldco's principals that Braga never signed and (ii) a co-investment agreement between Braga and the Fund that brought Braga into the deal. Braga contends the Fund breached the purchase agreement by agreeing to amend its terms shortly before the closing to exclude certain assets from being transferred to Newco without Braga's written consent. Braga also contends the Fund breached the co-investment agreement by depriving Braga of its right as a board observer to receive "board packages."

For the reasons discussed below, the court concludes that the Fund is entitled to judgment in its favor on all claims. As to the first issue, the court finds that Braga's written consent was not required to amend the purchase agreement and, even if it was, Braga failed to prove that it suffered any damages as a result of the amendment, which benefited Newco. As to the second issue, the court finds that the

1

Fund did not breach Braga's right to receive board packages based on the ordinary and usual meaning of that term.

## I. BACKGROUND

The facts recited in this opinion are the court's findings based on the testimony and documentary evidence presented during a two-day trial held in December 2019. The record includes stipulations of fact in the Pre-Trial Stipulation and Order, over 100 trial exhibits, four depositions, and live testimony from three fact witnesses.

### A. The Players

Newco is a Delaware limited liability company based in Florida that provides design engineering services.[1] Oldco is a Florida professional limited liability company wholly-owned by Steven Feller ("Feller") and Louise Feller (together, the "Sellers").[2] Newco acquired the assets that make up its business from Oldco in a transaction that closed on September 19, 2016 (the "Closing"). Feller serves as the President of Oldco and Newco.[3]

The Fund is a Delaware limited partnership with its principal place of business in New York, New York.[4] Musa Yenni is the Fund's managing partner.[5] The Fund

---

[1] JX 39 at 505-543 ("Amended Operating Agreement") (dated September 19, 2016) § 2.1.

[2] JX 8 ("Purchase Agreement"), Preamble.

[3] *Id*. Signature Pages; Amended Operating Agreement §§ 3.1(c)(i), 3.2.

[4] Pre-Trial Order ("PTO") ¶ 12 (Dkt. 179).

[5] Yenni Dep. 431-32. All citations to "Dep." refer to deposition transcripts (Dkt. 178).

negotiated and structured the Oldco/Newco transaction and brought Braga into the deal as a minority investor.

Braga is a Delaware limited liability company that maintains its corporate headquarters in New York, New York.[6]  Ricardo Braga has served as Braga's managing member since 2011.[7]  Ricardo's son, Rodrigo Braga, has served as a director and member of Braga since 2015.[8]  For clarity, this opinion refers to these two individuals respectively as "Ricardo" and "Rodrigo."

### B.    The Purchase Agreement

On November 16, 2015, the Fund entered into a Membership Interest Purchase Agreement with the Sellers and Oldco (the "Purchase Agreement).[9]  The Purchase Agreement, which designated Feller as the Sellers' Representative,[10] contemplates several transactions:

> i.    Sellers would transfer all of Oldco's assets and liabilities to Newco, except certain assets listed in Exhibit H as "Excluded Assets,"[11] in exchange for 100% of Newco's authorized but unissued membership interests;

---

[6] PTO ¶ 11.

[7] Tr. 274; Ricardo Dep. 8, 10-11.  All citations to "Tr." refer to the Trial Transcript Volumes I-II from December 3-4, 2019 (Dkt. 187; Dkt. 188).

[8] Rodrigo Dep. 8, 10.

[9] PTO ¶ 1; Purchase Agreement, Preamble.

[10] Purchase Agreement § 10.02(a).

[11] *Id.* at H-1 ("Exhibit H") (listing cash, sports and entertainment tickets, certain personal property and personal communication equipment).

3

ii. The Fund as "Buyer" would invest up to $2.4 million in cash in Oldco in exchange for 80% of the equity interests in Newco;

iii. Newco would secure a loan of at least $8.6 million; and

iv. Newco would place $990,000 in escrow and distribute $8.91 million to Oldco to redeem Newco membership interests such that Buyer would own 80% of the equity interests in Newco and Oldco would own the remaining 20%.[12]

The Purchase Agreement contains a representation and indemnification rights with respect to accounts receivable that have not been collected for 120 days or longer ("Aged AR"). Specifically, Oldco and Sellers represented under Section 3.13 that Oldco's accounts receivable were, subject to a bad debt reserve, "collectible in full within one hundred twenty (120) days after billing," and agreed in Section 8.02, jointly and severally, to indemnify the Fund and Newco for a breach of this representation.[13]

Section 2.04 of the Purchase Agreement provides for an adjustment (the "Working Capital Adjustment") if the working capital transferred to Newco at Closing (the "Closing Working Capital") deviates from the "Target Net Working Capital," which was set at $3.8 million based on the fourteen-month trailing average of Oldco's working capital.[14] Under Section 2.04(a), if the Closing Working Capital

---

[12] PTO ¶¶ 14, 27; Purchase Agreement § 2.01.

[13] Purchase Agreement §§ 3.13, 8.02(a). Section 3.13 further provides that, "[s]hould Newco seek and be indemnified for a breach of this Section 3.13 Newco shall, upon receipt of such indemnity, transfer and assign such accounts receivable to [Oldco] and Sellers."

[14] *Id.* at 1-I; Tr. 378 (Yenni); JX 2.

is less than the Target Net Working Capital, then Oldco or the Sellers must promptly pay Newco the amount of the shortfall, and if Closing Working Capital is greater than the Target Net Working Capital, then Newco must issue to Oldco a promissory note in the amount of the surplus, payable starting within a year of Closing.[15]

## C. The Fund's "False Panic" Over Working Capital

In the summer of 2016, the Fund became concerned about a potential Working Capital Adjustment in Oldco's favor. On June 26, 2016, Yenni advised Feller, that "[i]f the working capital is verified to be $5.3 million, we need to pay you the difference via a two year note," which would violate Newco's covenants with its potential lenders.[16] Later that day, Yenni wrote back to Feller that this was a "false panic for us and the lenders" because "almost $2 million of the $5.5 million [accounts receivable] is over 120 days and would not be included in the surplus calculation, therefor[e] eliminating any surplus" and not requiring Newco to issue a note.[17] Feller responded by email "Good."[18]

Yenni subsequently emailed a Fund employee explaining the "false panic" and how "almost $2M of the $5.5M in AR is over 120 days old, [therefore] it would

---

[15] Purchase Agreement § 2.04(a).

[16] JX 3 at 1.

[17] *Id.*

[18] *Id.*

5

not be considered in the calculation of the surplus!"[19] A few weeks later, in an email to the Fund's accountant, Yenni reiterated that Aged AR would not be considered in the calculation.[20]

### D. The Co-Investment and Joinder Agreements

In August 2016, the Fund approached Braga regarding an opportunity to invest in Newco.[21] Although the Fund originally asked Braga to invest in the Fund, Braga declined and sought to make a direct investment in Newco.[22]

On August 25, 2016, the Fund provided Braga with an investment memo it had created to summarize the terms of the transaction.[23] The investment memo included a slide titled "Proposed Transaction Structure" that stated: "Net Working Capital Target was set at $3.8 million. If there is a surplus at close, it will be payable to Seller within two years. Only AR aged less than 120 days will be considered."[24] On August 26, 2016, the Fund provided Braga with a copy of the Purchase Agreement.[25]

---

[19] JX 4 at 1.

[20] JX 5 at 2.

[21] PTO ¶ 28.

[22] *Id.* ¶ 29.

[23] *Id.* ¶ 30.

[24] *Id.* ¶ 31; JX 7 ("Investment Memo") at 39.

[25] PTO ¶ 34.

After reviewing the diligence documents, Braga agreed to become a co-investor in Newco. On September 2, 2016, Braga and the Fund entered into an agreement whereby Braga would purchase 23.3% of the equity of Newco for $700,000 (the "Co-Investment Agreement").[26] Braga represented in the Co-Investment Agreement that it "reviewed the [Purchase Agreement] and all exhibits," "had an opportunity to consult with advisors," and "is a sophisticated investor experienced in making such investments."[27]

Braga asked for a seat on Newco's board of managers (the "Board") so that it could "be privy to monitoring [its] investment[] and add value."[28] The Fund declined this request but offered instead, and Braga accepted, certain board observer rights that are documented in the Co-Investment Agreement.[29]

The Co-Investment Agreement recites that Braga "intends to be a passive investor in Newco."[30] Consistent with this intention, the Co-Investment Agreement provided that the Fund had the right to "vote [Braga's] equity interest in Newco for so long as [Braga] owns any equity interest in Newco and this grant shall constitute

---

[26] JX 9 ("Co-Investment Agreement").

[27] *Id.* § 7(e).

[28] Tr. 28 (Ricardo), 277 (Rodrigo); JX 106 at 2 (Braga's conference call notes).

[29] Co-Investment Agreement § 4.

[30] *Id.*

7

an irrevocable power of attorney to do so at all meetings of equity holders and for any other purpose equity owners are called to vote or consent."[31]

The Co-Investment Agreement references that Braga had "agreed to enter into a so-called Joinder Agreement pursuant to which it shall be deemed to be a Buyer under the [Purchase Agreement] and will be entitled to all of the rights and subject to all of the obligations described in the [Purchase Agreement]."[32] On September 8, 2016, Braga signed the contemplated joinder agreement (the "Joinder Agreement").[33] Although the record is unclear as to the precise timing, Yenni, on behalf of Newco, would eventually countersign the Joinder Agreement at or around the Closing.[34]

### E. The Side Letter

In mid-September 2016, Oldco began to prepare its pre-Closing certificate and hired Marc Horowitz, who became Newco's CFO after the Closing, as an independent contractor to assist in the financial and accounting transition between the two companies.[35] On September 12, 2016, Oldco sent the Fund its "good faith" estimate of the Closing Working Capital showing a shortfall from the Target

---

[31] *Id.* § 5.

[32] *Id.* § 3.

[33] JX 14 ("Joinder Agreement").

[34] *See* JX 107 (September 14, 2016 email discussing who should countersign the Joinder Agreement on behalf of Newco).

[35] Horowitz Dep. 12-14; JX 10.

Working Capital of approximately $372,000, which the Fund forwarded to Braga, among others.[36]

On September 15, 2016, counsel for Oldco and Sellers circulated a "final" estimate of Closing Working Capital, dated September 14, 2016, reflecting a smaller shortfall of approximately $130,000 (the "September 14 Estimate").[37]  According to Horowitz, both of these estimates reflected over $2 million in Aged AR as adjusted to reflect the transfer and indemnity provisions of Section 3.13 of the Purchase Agreement.[38]  Later on September 15, counsel for Oldco and the Sellers retracted the September 14 Estimate as incorrect and took the position that the Aged AR should not be adjusted for on the worksheet unless it remained with Oldco.[39]

Because the Sellers' estimated Closing Working Capital reflected $6.2 million of accounts receivable, of which approximately $2 million was Aged AR, the Sellers' approach would have resulted in a Working Capital Adjustment in favor of Oldco of over $2 million for which Newco would have to issue a promissory note. To avoid this result, Yenni proposed an alternative arrangement to exclude approximately $2 million of Aged AR from the assets to be transferred to Newco and place the proceeds into escrow with 20-25% of the collections passing to

---

[36] JX 15.

[37] JX 21.

[38] Horowitz Dep. 54-55; *see* JX 10 at 1.

[39] JX 19.

9

Newco.[40]  Yenni informed the lenders that this new arrangement was warranted because Oldco's "AR has increased to $6.2MM compared to the $3.8MM target we had set."[41]  In reality, however, the amount of Oldco's accounts receivable had not changed.  Rather, the Sellers were insisting on including the Aged AR as an asset in the working capital calculation, rather than excluding it from the calculation as Yenni mistakenly thought would be the case.

On September 16, 2016, Sellers sent an email in which they insisted on retaining 100% of the collections instead of allowing Newco to retain 20-25% of them, as Yenni had proposed.[42]  The Fund agreed to this proposal six minutes later, without consulting Braga or the lenders.[43]

During the evening of September 16, a Fund employee emailed Rodrigo the September 14 Estimate in response to his request for a copy of Oldco's working capital file with information on the accounts receivable.[44]  The email referred to a tab in the attachment reflecting Aged AR "totaling to $2.027 million . . . being transferred to [Oldco] upon closing."[45]  Rodrigo responded later in the evening,

---

[40] JX 22 at 2.

[41] JX 20 at 1.

[42] JX 26.

[43] *Id.*

[44] JX 23; Tr. 340 (Rodrigo).

[45] JX 23.

10

stating that he would look at the file that night and "touch base" tomorrow.[46] Referencing the earlier stage of the negotiations with the Sellers, the Fund employee further clarified that "[w]e are transferring 100% of [the Aged AR] to Steve so [we are] no longer receiving the 20-25% of it that was earlier expected."[47] Rodrigo forwarded this email exchange to Ricardo.[48]

In a separate email sent during the evening of September 16, Yenni told Ricardo that "[w]e had to resolve some issues around the calculation of surplus Working Capital that would be due to the Seller additionally" and the Fund had "just come to a simple agreement with Steve that he will keep the AR over 120 days or longer."[49] Yenni went on to write that "[t]his change to the Purchase Agreement will be documented via a short side letter which our attorneys will draft by Monday morning" and that he believed the closing would occur on September 19, 2016.[50] Ricardo forwarded Yenni's message to Rodrigo, who promptly responded that Yenni's message was in line with what the father and son had discussed earlier.[51] Ricardo did not seek any clarification of Yenni's message.[52]

---

[46] JX 24.

[47] *Id.*

[48] *Id.*

[49] JX 25.

[50] *Id.*

[51] *Id.*

[52] Tr. 46-47 (Ricardo).

On September 17, after Yenni updated Newco's prospective lenders on the "simple agreement" he had reached with the Sellers, they raised concerns, writing, "Didn't we plan on owning and collecting those A/R for [Newco]? Won't we now have to finance the cash flow we expected from those A/R?"[53] The next day, Yenni relayed to Feller the lenders' concerns about running Newco with significantly less accounts receivable, reminded Feller of their prior discussion about the potential need for a working capital note, and asked him to forego seeking reimbursement for the Sellers' transaction expenses.[54] Specifically, Yenni wrote to Feller that:

> The Purchase Agreement we signed is clear on the definition of Accounts Receivables excluding anything over 120 days (Section 3.13). That is what guides the calculation of Working Capital (Section 2.04). Hence, the [September 14 Estimate] was correct per the Purchase Agreement. I had a scare on that about a month ago, thinking we may need to have a large Working Capital Note violating lender covenants. Then I re-read the Purchase Agreement. Then you and I confirmed that the 120+day AR would be excluded. The Purchase Agreement we signed never excluded those receivables from being transferred to Newco.

> * * * * *

> I refreshed overnight. I believe I can convince the lenders to the reneging of the Purchase Agreement and get the deal closed hopefully tomorrow as follows. We amend the Purchase Agreement allowing you to keep $2M of that AR, which we already reported to both lenders. Your keeping any larger amount will not work. However, you have to

---

[53] JX 27.

[54] JX 29; JX 30.

forego all transaction fees you were supposed to be reimbursed for. You will not get reimbursed for them period.[55]

Ultimately, Yenni was able to secure a concession from the Sellers in the form of a cap on their right to be reimbursed for professional fees, saving Newco $200,000.[56] Newco's lenders were unimpressed. In an email to Yenni, one lender sarcastically wrote that "[g]iving up $200,000 of expense for an[] extra few million of A/R seems like a very good deal to me."[57]

On September 19, 2016, the Fund, the Sellers, and Oldco entered into a letter agreement memorializing their last-minute negotiations (the "Side Letter").[58] The Side Letter's key terms included:

- Excluding $2,027,995 of Oldco's Aged AR, which represented the amount of accounts receivable that was 120 days past due as of September 14, 2015 (the "Excluded AR"), from the assets to be transferred to Newco at Closing by adding the Excluded AR to the list of "Excluded Assets" on Exhibit H of the Purchase Agreement that Oldco would retain;

- Providing that "Sellers and [Oldco] shall be responsible for all of their legal and other Transaction expenses in excess of $100,000 as well as all pre-closing professional claims expense in excess of insurance received and related legal fees as currently provided in the Purchase Agreement;" and

---

[55] JX 30 at 1-2.

[56] *Id.* at 1.

[57] JX 31 at 2.

[58] JX 37 ("Side Letter"); PTO ¶ 67.

13

- Providing that "[a]ny adjustments to be proposed by the Buyer's Post-Closing Statement concerning accounts receivable shall be on an accrual basis and shall exclude all of the Excluded AR."[59]

## F.     The Closing and Post-Closing Events

On September 19, 2016, the transaction closed.  Newco became the Fund's first and only investment and Yenni became Newco's executive chairman and its managing member alongside Feller.[60]  On the Closing call, the parties discussed the material terms of the transaction, which included the Side Letter and the Excluded AR.[61]  Ricardo, who participated on the call, raised a question about the terms of a "junior loan" but did not raise any objections about the Side Letter or the Excluded AR.[62]

Shortly after the Closing call, Ricardo participated in a call with Newco's Board members, observers, and consultants during which Oldco's retention of the Excluded AR was discussed.[63]  In connection with this discussion, Braga received materials regarding the breakdown of the Excluded AR and a final accounts

---

[59] Side Letter.

[60] Amended Operating Agreement § 3.2; Yenni Dep. 81; PTO ¶ 74.

[61] JX 40; Tr. 396 (Yenni).

[62] *See* JX 41.

[63] JX 42.

14

receivable aging report.[64]  Ricardo again raised no objections during this post-closing call regarding the Side Letter and the Excluded AR.

On September 22, 2016, in an email exchange with Yenni, Ricardo acknowledged that "[w]e had issues at the last minute of the closing with the AR's that motivated renegotiation with [Seller] and also with [the lender]."[65]  Braga still had raised no objections concerning the Side Letter.

On October 10, 2016, Braga received a copy of the Side Letter for the first time.[66]  After receiving the copy, Braga raised no objections regarding its terms or how it was approved.

On October 20, 2016, Braga received notice of Newco's first board meeting to be held on October 24 with an agenda attached.[67]  The agenda advised that the first substantive item to be discussed and resolved was the "[r]atification of all matters taken in connection with the acquisition of [Oldco], including the financing thereof."[68]

---

[64] *Id.*

[65] JX 43.

[66] Tr. 195 (Ricardo); JX 46 at 1.

[67] JX 48.

[68] *Id.*

On October 24, 2016, Ricardo attended Newco's first Board meeting as a board observer.[69] At the meeting, the Board ratified the acquisition of Oldco without any objection.[70] According to the minutes, Ricardo spoke and weighed in on a variety of matters but raised no objections regarding the Side Letter, its terms, or how it was approved.[71]

Less than two months after the Closing, Newco began experiencing cash flow problems. Originally, the Fund had agreed to collect the Excluded AR on Oldco's behalf and at Newco's expense, and to transfer the proceeds back to Oldco.[72] In early November, the Fund suggested deferring the transfer to Oldco of any collected Excluded AR so that Newco could use it for operations.[73] Braga agreed with this approach[74] and suggested sending the Side Letter to the Sellers to assist in negotiating a payment plan for the collected Excluded AR.[75] Eventually, Sellers agreed to let Newco defer payment of the collected Excluded AR so that Newco could use the proceeds for its operating expenses.[76]

---

[69] JX 50.

[70] *Id.*

[71] *Id.*

[72] Horowitz Dep. 43.

[73] JX 52.

[74] *Id.*

[75] JX 53.

[76] Tr. 404 (Yenni).

16

In December 2016, Newco began to prepare the Buyer's post-closing statement, as required under the Purchase Agreement. Braga was involved and contributed to the calculation of the final Working Capital Adjustment, referencing and factoring in the terms of the Side Letter.[77]

On January 17, 2017, Newco circulated the Buyer's post-closing statement, which set forth Newco's determination of the Closing Working Capital.[78] The statement reflected that with Oldco's retention of the Excluded AR, the Closing Working Capital totaled $2,878,527, resulting in a shortfall by Sellers of $921,473.[79] Sellers did not dispute the Buyer's post-closing statement and accounted for the $921,473 adjustment by cancelling Newco's debt to Oldco for the deferred transfer of the collected Excluded AR and releasing funds from the escrow.[80]

### G. Braga's Board Observer Rights

At Closing, Braga's Board observer rights, as described in the Co-Investment Agreement, were incorporated into Newco's operating agreement effective as of the date of Closing.[81] Shortly after the Closing, Braga received a Board package and an

---

[77] JX 59.

[78] JX 60.

[79] *Id.*

[80] JX 60; PTO ¶ 82.

[81] Amended Operating Agreement § 3(c)(i). The amended operating agreement is the subject of the parties' separate litigation in this court. *See infra* Part II.

invitation to attend Newco's first Board meeting. On October 17, 2016, Yenni requested that Horowitz deliver "a complete board package" to the Board members and observers, including Braga.[82]

On October 20, 2016, Horowitz circulated a notice of the Board meeting scheduled for October 24.[83] On October 21, 2016, the Fund added Braga to Newco's data room, which included "important shared files" and marketing material.[84] At the Board meeting held on October 24, the Board ratified Braga's Board observer status.[85]

On January 26, 2017, the Fund, Newco's vice-president, and Feller agreed that Braga's board observer status should be rescinded because Braga had filed an action in New York State court against the Fund.[86] By e-mail that same day, the Fund advised Braga that, in light of the commencement of the lawsuit, "[y]our board observer status has been rescinded effective immediately until we resolve this matter."[87] Braga did not attend the January 27, 2017 Board meeting, the minutes of which reflect that no Board member or observer raised any objection in response to

---

[82] JX 47.

[83] JX 48.

[84] JX 49.

[85] JX 50.

[86] JX 62.

[87] JX 63.

the rescission of Braga's Board observer status.[88]  On February 7, 2017, Braga amended his New York complaint to add claims regarding the revocation of its Board observer status.[89]

On February 23, 2017, the Fund restored Braga's Board observer rights and provided Braga with a copy of the minutes of the January 27, 2017 Board meeting it had missed, along with a budget and cash forecast that had been prepared for Board members.[90]  From February 2017 forward, Braga was invited to attend all Newco Board meetings and received the Board packages that were sent to Board members.[91]

## II.    PROCEDURAL HISTORY

On May 22, 2017, Braga filed its initial complaint in this action,[92] which was amended on September 7, 2017.[93]  The amended complaint (the "Complaint") asserts four claims.  Count I asserts that the Fund breached Section 10.10 of the Purchase Agreement when it entered into the Side Letter without Braga's express written consent to remove the Excluded AR from the assets that were transferred to Newco.[94]  Count II seeks a declaration that the Fund breached the Co-Investment

---

[88] *Id.*; JX 69 at 13.

[89] JX 64.

[90] JX 69.

[91] PTO ¶¶ 88-89; Tr. 413 (Yenni).

[92] Dkt. 1.

[93] Dkt. 34 ("Compl.").

[94] Compl. ¶¶ 33-39.

Agreement by depriving Braga of its Board observer rights and damages for the breach.[95] Count III seeks specific performance of the Co-Investment Agreement to enforce Braga's Board observer rights.[96] Count IV asserts that the Fund breached its fiduciary duties.[97]

On September 26, 2017, the Fund moved to dismiss Counts I and IV.[98] In April 2018, the court denied the motion as to Count I and granted it as to Count IV.[99]

On May 31, 2019, Braga filed a separate lawsuit in this court against Yenni and the Fund.[100] Braga alleges in that action that Yenni and the Fund breached Newco's 2015 operating agreement by purporting to amend that agreement without Braga's approval and seeks a declaratory judgment that the amended operating agreement is invalid.[101] On February 25, 2020, the court denied Yenni and the Fund's motion to dismiss.[102] The parties are currently engaged in discovery.

---

[95] *Id.* ¶¶ 40-44.

[96] *Id.* ¶¶ 45-51.

[97] *Id.* ¶¶ 52-57.

[98] Dkt. 36.

[99] *See* Mot. to Dismiss Tr. Ruling 14-16 (Apr. 30, 2018) (Dkt. 49).

[100] *Braga Inv. & Advisory LLC v. Musa Yenni and Yenni Income Opportunities Fund I, L.P.*, C.A. 2019-0408-AGB.

[101] C.A. 2019-0408-AGB, Dkt. 1.

[102] C.A. 2019-0408-AGB, Dkt. 20.

The court held a two-day trial in this action in December 2019 and heard post-trial argument on April 9, 2019.[103]

## III. ANALYSIS

Braga seeks to enforce the terms of two separate agreements: the Purchase Agreement and the Co-Investment Agreement. To establish a claim for a breach of contract under Delaware law, a plaintiff must prove: (i) the existence of a valid and enforceable contract; (ii) that the defendants breached the contract; and (iii) that the plaintiff was damaged as a result of those breaches.[104] As the party seeking to enforce each contract, Braga bears the burden to prove its breach of contract claims by a preponderance of the evidence.[105] Braga also bears the burden of proving that it is entitled to specific performance by clear and convincing evidence.[106]

Under Delaware law,[107] courts are required to give unambiguous contract terms their plain meaning, without regard to extrinsic evidence.[108] Delaware law "adheres to the objective theory of contracts, *i.e.*, a contract's construction should be

---

[103] Dkt. 181; Dkt. 198.

[104] *Ivize of Milwaukee, LLC v. Compex Litig. Supp., LLC*, 2009 WL 1111179, at *8 (Del. Ch. Apr. 27, 2009) (citations omitted).

[105] *Zimmerman v. Crothall*, 62 A.3d 676, 691 (Del. Ch. 2013).

[106] *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 31 (Del. Ch. 2001).

[107] The Purchase Agreement is governed by Delaware law. Purchase Agreement §10.11(a). Although the Co-Investment Agreement has no choice of law provision, both parties rely on Delaware law to construe the agreement in their papers. The court thus does the same.

[108] *Norton v. K–Sea Transp. P'rs, L.P.*, 67 A.3d 354, 360 (Del. 2013).

that which would be understood by an objective, reasonable third party."[109] When interpreting a contract, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement," construing the agreement as a whole and giving effect to all of its provisions.[110]

Braga asserts that the Fund breached each contract's express terms and is entitled to damages for the Fund's breach of both agreements and specific performance of the Co-Investment Agreement. The court considers each claim in turn.

## A. The Purchase Agreement Claim

The Purchase Agreement, as executed on November 16, 2015, included all accounts receivable of Oldco as assets to be transferred from Oldco to Newco. To be more specific, Section 2.01 of the Purchase Agreement obligated Oldco to transfer "all of its assets" to Newco at Closing except for certain "Excluded Assets" listed on Exhibit H, which originally did not include any accounts receivable as an excluded asset.[111] The plain terms of the Side Letter, however, which was signed in connection with the Closing on September 19, 2016, amended Exhibit H of the

---

[109] *Salomone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014) (citation omitted).

[110] *Id.* at 368.

[111] Purchase Agreement §2.01; Exhibit H.

Purchase Agreement to list $2,027,995 of Oldco's Aged AR (as defined above, the "Excluded AR") as an excluded asset.[112]

Braga contends the Fund breached Section 10.10 of the Purchase Agreement by purporting to amend Exhibit H via the Side Letter to remove the Excluded AR from the assets to be transferred to Newco without his prior written consent. Section 10.10 provides that the Purchase Agreement may only be amended "by an agreement in writing signed by the Buyer [the Fund], the Company [Oldco] and the Sellers' Representative [Feller]."[113] According to Braga, its written consent to the Side Letter amendment of the Purchase Agreement was necessary because Braga became a "Buyer" under the Purchase Agreement when it entered into the Joinder Agreement. For this alleged breach of the Purchase Agreement, Braga seeks $488,725 in damages.

The Fund contends that Braga's consent was not necessary to amend the Purchase Agreement because it was not a party to the Purchase Agreement when it was amended by the Side Letter. According to the Fund, "the Joinder Agreement was an invalid modification" because the Fund, Oldco, and the Sellers' Representative never approved it.[114] As a consequence, Braga was not a Buyer under

---

[112] Side Letter.

[113] Purchase Agreement §10.10.

[114] Def.'s Post-Trial Answering Br. 20 (Dkt. 193).

the Purchase Agreement when the Side Letter was signed and "Braga's written, signed consent to the Side Letter Agreement was not required."[115] The Fund also contends that, even if the Purchase Agreement was breached, Braga failed to prove any damages to the value of his investment in Newco resulting from the amendment in the Side Letter to remove the Excluded AR from the assets to be transferred to Newco.[116]

For the reasons explained below, the court concludes that (i) Braga's written consent to the Side Letter amendment was not required because Braga was not a "Buyer" under the Purchase Agreement when the Side Letter was executed and (ii) even if it was and the Fund breached Section 10.10 by executing the Side Letter without Braga's written consent, Braga failed to prove any damages.

### 1. Braga's Written Consent Was Not Required to Approve the Side Letter Amendment to the Purchase Agreement

Section 10.10 of the Purchase Agreement provides that it "may only be amended, modified or supplemented by an agreement in writing signed by" the

---

[115] *Id.* 19.

[116] The Fund contends, in the alternative, that even "if Braga were to be considered a 'Buyer' under the Purchase Agreement," he "waived, acquiesced to, or otherwise ratified" the amendment of the Purchase Agreement through his course of conduct. *Id.* 21. The court does not reach this issue.

"Buyer," Oldco, and the Sellers' Representative.[117]  The preamble of the Purchase Agreement defines "Buyer" to be the Fund.[118]

In connection with the Closing, Braga entered into the Joinder Agreement, which purports to give Braga "all of the rights and obligations of a 'Buyer' [under the Purchase Agreement] as if it had executed the [Purchase Agreement.]"[119] Critically, however, only Yenni, on behalf of Newco, countersigned the Joinder Agreement with Braga.[120]  The Joinder Agreement was not signed by *any* of the parties necessary under Section 10.10 of the Purchase Agreement to amend the Purchase Agreement, *i.e.*, the Fund, Oldco, or the Sellers' Representative.  Without the written consent of these three parties, the Joinder Agreement's purported modification to add Braga as a party to the Purchase Agreement is facially invalid.

Braga does not contend that the Fund, Oldco, and the Sellers' Representative gave their written consent to the Joinder Agreement.  Braga argues instead that this fact "does not matter" for three reasons:  (i) the Fund previously argued in this action that Braga was a "Buyer" under the Purchase Agreement, (ii) Yenni testified at trial that he believed the Joinder Agreement made Braga a "Buyer" under the Purchase Agreement, and (iii) the Joinder Agreement "was ratified by all necessary parties"

---

[117] Purchase Agreement § 10.10.

[118] *Id.* Preamble.

[119] Joinder Agreement.

[120] Def.'s Post-Trial Answering Br. 20; Joinder Agreement.

25

before the Side Letter was executed.[121] For the reasons discussed next, each of these arguments is without merit.

As to the first issue, Braga contends that the Fund conceded in its opening brief in support of its motion to dismiss that Braga became a party to the Purchase Agreement by entering into the Joinder Agreement.[122] Braga, however, does not provide any legal basis for why the Fund should be precluded from taking a different position at trial than it did in its motion to dismiss brief.[123] In fact, Braga acknowledged it was not aware of any legal doctrine to support that result.[124]

As to the second issue, Braga relies on Yenni's testimony that Braga became subject to the obligations and benefits of the Purchase Agreement when it signed the Joinder Agreement on September 8, 2016.[125] The legal effect of the Joinder

---

[121] Pl.'s Post-Trial Reply Br. 3-5 (Dkt. 194).

[122] *Id.* 5 (citing Def.'s Mot. to Dismiss Opening Br. 3, 11, 16 (Dkt. 36)).

[123] Although Braga never mentioned it in his post-trial briefs, the doctrine of judicial estoppel "prevents a litigant from advancing an argument that contradicts a position previously taken by that same litigant, and that [a court] was persuaded to accept as the basis for its ruling." *Julian v. E. States Constr. Serv., Inc.*, 2009 WL 1211642, at *6 (Del. Ch. May 5, 2009) (internal quotation marks and citation omitted) (alteration in original). This doctrine would not apply here because Braga failed to show that the court relied on any of the statements Braga identified from the Fund's motion to dismiss brief when the court ruled on that motion.

[124] Post-Trial Tr. 36 (Apr. 9, 2020) (Dkt. 199). ("There's no legal doctrine that I am aware of that says that they are bound by everything in their motion to dismiss brief.").

[125] *See* Tr. 440 (Yenni) ("Q. It was your understanding when the Bragas signed the Joinder Agreement that they were subject to all of the obligations under the Purchase Agreement. Yes? A. Yes, generally. Q. And entitled to all the benefits afforded under the Purchase Agreement as well. Yes? A. Yes, generally."); *see also id.* 434 (Yenni) ("Q. And with

26

Agreement, however, is an issue for the court to decide irrespective of whatever subjective belief the Fund or Braga may have had about its meaning.[126] As explained above, the effectiveness of the Joinder Agreement's purported modification of the Purchase Agreement is governed by the unambiguous terms of the written consent requirement in Section 10.10 of the Purchase Agreement. That provision indisputably was not satisfied because Oldco and the Sellers' Representative (as well as the Fund) did not consent in writing to the Joinder Agreement.

As to the third issue, Braga contends that "the uncontested evidence shows that [the Joinder Agreement] was ratified by all necessary parties before the [Side Letter] was executed."[127] For support, Braga points to a single email exchange on

respect to this Joinder Agreement, you testified earlier this morning that you signed that in order to make Braga a buyer under the Purchase Agreement. Correct? A. Yes."). Braga does not point to any evidence that Oldco or the Sellers' Representative shared a similar subjective understanding.

[126] *See Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019) (The court's "task is to fulfill the parties' shared expectations at the time they contracted. [B]ut because Delaware adheres to an objective theory of contracts, the contract's construction should be that which would be understood by an objective, reasonable third party.") (internal quotation marks and citation omitted); *Salomone*, 106 A.3d at 367-68 ("When interpreting a contract, this Court will give priority to the parties' intentions *as reflected in the four corners of the agreement*.") (citation omitted) (emphasis added); *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006) ("[T]he true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought [the words] meant.") (internal quotation marks and citation omitted).

[127] Pl.'s Post-Trial Reply Br. 3. Braga also argues that "Newco's transmittal of the Joinder Agreement to Braga constituted an offer and . . . all that was required to bind the parties was Braga's acceptance, which occurred when Braga returned it signed" on September 8, 2016. *Id.* 4. This argument has nothing to do with the Purchase Agreement, which is the

September 14, 2016, between counsel for the Fund and the Sellers.[128] In one of these emails, Sellers' counsel lists ten transaction documents and suggests that Yenni sign "for Newco" on three of them instead of Feller signing "for Newco."[129] One of these documents is the "Joinder for Braga."[130] According to Braga, the email exchange supports ratification because it demonstrates that "despite the fact that the parties didn't sign the agreement, they all had copies of it and they all agreed that it should be signed" and therefore "everybody understood that Braga was a buyer before the closing."[131] The court disagrees.

Under Delaware law, "[r]atification is an equitable defense that precludes a party who has accepted the benefits of a transaction from thereafter attacking it."[132] As our Supreme Court has explained, ratification may be express or implied through conduct in certain circumstances:

> Ratification may be either express or implied through a party's conduct, but it is always a voluntary and positive act. . . . Implied ratification occurs where the conduct of a complainant, subsequent to the transaction objected to, is such as reasonably to warrant the conclusion

---

contract Braga seeks to enforce. Even if the Joinder Agreement constitutes a valid contract between Newco and Braga, it did not alter the rights and obligations under the Purchase Agreement because it lacks all of the written consents required under Section 10.10.

[128] *Id.* 3 (citing JX 107).

[129] *Id.*

[130] *Id.*

[131] Post-Trial Tr. 10-11.

[132] *Genger v. TR Inv'rs, LLC*, 26 A.3d 180, 195 (Del. 2011) (internal quotation marks and citations omitted).

that he has accepted or adopted it, and his ratification is implied through his acquiescence. Ratification of an unauthorized act may be found from conduct which can be rationally explained only if there were an election to treat a supposedly unauthorized act as in fact authorized.[133]

Even assuming *arguendo* that Yenni's testimony (discussed above) and his provision of the Joinder Agreement to Braga[134] constituted an express or implied ratification of its terms on behalf of the Fund, Braga has failed to prove by a preponderance of the evidence that *Feller* ratified the Joinder Agreement as a principal of Oldco and/or as Sellers' Representative.

Braga did not provide any evidence that Feller expressly accepted that Braga was a "Buyer" under the Purchase Agreement, verbally or in writing, before the Side Letter was signed. The only question, therefore, is whether Feller implicitly ratified the Joinder Agreement's terms on behalf of Oldco and as Sellers' Representative via his counsel's September 14 email to the Fund's counsel.

Contrary to Braga's assertions, the text of the September 14 email regarding who should sign "for Newco" on the "Joinder for Braga" does not support an implicit ratification because it cannot rationally be interpreted to mean that Feller had accepted its terms on behalf of Oldco or the Sellers' Representative. Rather, the plain terms of this email exchange reflect that counsel were discussing a simple

---

[133] *Id.* (internal quotation marks and citations omitted).

[134] JX 13 (September 8, 2016 email from Yenni to Ricardo transmitting draft of Joinder Agreement).

29

issue: who, as between Feller and Yenni, should sign the Joinder Agreement "*for Newco*" as its managing member.[135] It is not surprising that this would be a subject of discussion at the time because Newco's governance structure was expected to change in connection with the Closing.[136]

Contemporaneous evidence also shows that Feller and his counsel took care to properly document changes to the terms of the Purchase Agreement in accordance with Section 10.10 when they wished to do so. For example, on September 19, just five days after the September 14 email exchange, Yenni (on behalf of the Fund) and Feller (on behalf of Oldco and as Sellers' Representative) executed the Side Letter to remove the Excluded AR from the assets to be transferred at Closing.[137]

Putting the September 14 email exchange aside, the record shows that Feller never treated Braga as a "Buyer" at any time before execution of the Side Letter. Although the Fund kept Braga informed of developments during the negotiations, Braga never participated in the negotiations of the transaction with the Sellers; the Fund and its own counsel were the sole negotiators with the Sellers; and the Fund was involved in the day-to-day activity to close the deal with Feller, not Braga.[138]

---

[135] JX 107 at 3 (emphasis added).

[136] *See* Amended Operating Agreement §§ 3.1(c)(i), 3.2 (Yenni became Newco's Chairman and a managing member along with Feller, who continued to serve as Newco's President).

[137] Side Letter at 3.

[138] Tr. 140-41 (Ricardo), 340 (Rodrigo), 385, 390 (Yenni); JX 15; JX 23; JX 24; JX 25.

Based on the preponderance of the evidence, the court finds that neither Oldco nor the Sellers' Representative ratified the Joinder Agreement before the execution of the Side Letter. Accordingly, Braga has failed to establish that the Joinder Agreement validly modified the Purchase Agreement to make Braga a "Buyer" before the Side Letter was executed such that the Side Letter required Braga's written consent under Section 10.10 of the Purchase Agreement.[139]

### 2. Braga Failed to Prove Damages

Under Delaware law, "a breach of contract claim . . . requires a showing of compensable injury."[140] To be compensable, the plaintiff must prove "damages that the plaintiff suffered as a result of the breach."[141] To satisfy this element, "a plaintiff must show both the existence of damages provable to a reasonable certainty, and that the damages flowed from the defendant's violation of the contract."[142]

"The proper measure of damages for breach of contract is an amount sufficient to restore the injured party to the position it would have been in had the breach not occurred."[143] "The proponent must prove its damages by a preponderance of the

---

[139] In reaching this conclusion, the court expresses no opinion on whether Braga became a Buyer under the Purchase Agreement at the Closing or thereafter.

[140] *Kronenberg v. Katz*, 872 A.2d 568, 606 (Del. Ch. 2004).

[141] *eCommerce Indus., Inc., v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *13 (Del. Ch. Sept. 13, 2013).

[142] *Id.* (citing *LaPoint v. AmerisourceBergen Corp.*, 2007 WL 2565709, at *9 (Del. Ch. Sept. 4, 2007)).

[143] *Ivize*, 2009 WL 1111179, at *10 (internal quotation marks and citations omitted).

evidence, and, while absolute precision is not required, mere speculation is not sufficient."[144]

Complicating the court's consideration of damages in this case, neither side retained a damages expert. Rather, Braga put forward its own mathematical calculation of the damages Newco allegedly suffered for which it contends it is entitled to a *pro rata* share based on its membership interest in Newco. Specifically, Braga seeks $488,725 in damages on the assumption that the Side Letter was invalid.

Braga followed four steps to calculate this amount.[145] First, Braga contends that, if the Side Letter had not been executed, Newco would have received at Closing additional assets worth $2,027,995 in the form of the Excluded AR, *i.e.*, the amount of Aged AR as of September 14, 2020. Second, Braga contends that an additional $267,608 of Aged AR—representing accounts receivable that became 120 days past due between September 15, 2016 and September 18, 2016 that *was transferred to Newco at Closing*[146]—should have been excluded when calculating the Closing Working Capital, which would have resulted in a "$267,608 working capital adjustment in [Newco's] favor."[147] The sum of the first two steps ($2,027,995 + $267,608) is $2,295,603. Third, Braga subtracts from this amount $200,000,

[144] *Id.*

[145] *See* Pl.'s Post-Trial Br. 47-48 (Dkt. 191).

[146] Tr. 407 (Yenni); JX 60.

[147] Pl.'s Post-Trial Br. 47.

representing the savings in transaction expenses Newco obtained in the Side Letter, which leaves a balance of $2,095,603. Fourth, Braga multiplies this figure by its percentage membership interest in Newco (23.3%) to arrive at $488,725.[148]

Braga's calculation would be a reasonable estimate of damages *if* the transfer of the Excluded AR to Newco at Closing actually would have increased the net asset value of Newco by approximately $2 million; *if* the $267,608 of additional accounts receivable should have been excluded from Closing Working Capital even though they were transferred to Newco at Closing; and *if* Braga had a right to receive a *pro rata* share of damages that Newco allegedly suffered.[149] These three assumptions underlie steps one, two, and four of Braga's calculation. For the reasons discussed below, however, none of these assumptions is valid.

The first assumption is incorrect because of the operation of the Working Capital Adjustment provision in the Purchase Agreement. As discussed above, Section 2.04 provides for a Working Capital Adjustment if the Closing Working Capital deviated from the Target Net Working Capital, which was set at $3.8

---

[148] ($2,295,603 - $200,000 = $2,095,603) x 0.233 = $488,275.

[149] Braga's calculation assumes that Aged AR (*i.e.*, receivables past due for over 120 days) should be valued at face value and not discounted for the risk of collection. This assumption seems reasonable given that Oldco represented in the Purchase Agreement that "accounts receivable arising after the date thereof" (*i.e.*, November 16, 2015) "are collectible in full within one hundred twenty (120) days after billing" and agreed to indemnify Newco for a breach of that representation. Purchase Agreement §§ 3.13, 8.02(a); *see also* Tr. 234-35 (Ricardo), 398 (Yenni).

million.[150]  Specifically, under Section 2.04(a), if the Closing Working Capital was less than the Target Net Working Capital, then Oldco or the Sellers were obligated to promptly pay Newco the amount of the shortfall, and if Closing Working Capital was greater than the Target Net Working Capital, then Newco was obligated to issue to Oldco a promissory note in the amount of the surplus, payable starting within a year of Closing.[151]

Yenni testified at trial without contradiction that, without the Side Letter, the net effect to Newco of receiving the Excluded AR would have been a "wash."[152] This result is demonstrated by comparing the outcome of the Working Capital Adjustment calculation (i) that was conducted after the Closing in accordance with the Side Letter and (ii) if it had been conducted without regard for the Side Letter.

After the Closing, the parties to the Purchase Agreement followed the procedures in Section 2.04 to determine the Working Capital Adjustment in accordance with the Side Letter.  The parties thus excluded approximately $2 million of Excluded AR from the calculation of Closing Working Capital.[153]  This yielded a shortfall from the Target Working Capital of approximately $900,000.[154]  Thus, the

---

[150] *See supra* Part I.B.

[151] Purchase Agreement § 2.04(a).

[152] Tr. 399-400 (Yenni).

[153] JX 60 at 4 (noting the exclusion of $2,027,995 for "Agreed A/R Past Due 120+ Days").

[154] *Id.* (reflecting a $921,473 shortfall from Target Working Capital).

net result of calculating the Working Capital Adjustment in accordance with the Side Letter is that Oldco became obligated to pay Newco approximately $900,000.

Had the parties disregarded the Side Letter and included the Excluded AR in calculating the Closing Working Capital, the Target Working Capital would have been exceeded by approximately $1.1 million, representing a $2 million swing from a shortfall of $900,000.[155] This outcome would have had two consequences. First, because the shortfall would have been eliminated, Newco would no longer be entitled to receive approximately $900,000 from Oldco. Second, because an excess over the Target Working Capital would have been created, Newco would be obligated under the Purchase Agreement to pay Oldco approximately $1.1 million by delivering "a non-negotiable promissory note" to Oldco for the amount of the surplus.[156] In other words, the benefit of Newco retaining approximately $2 million of Excluded AR would have been offset dollar-for-dollar by (i) the loss of cash Oldco otherwise would have had to pay Newco ($900,000) and (ii) Newco's incurrence of debt to pay Oldco for exceeding the Target Working Capital ($1.1 million).

_____

[155] *See* Tr. 408 (Yenni) ("Q. And, Mr. Yenni, had there not been a side letter agreement and had the 2 million in Aged AR been kept on Newco's books, what would the numbers in the buyer's post-closing look like? A. The 4.15 million, at the very top right, would have increased by that exact amount and would have become $6.15 million. And with all other things being equal, it would have resulted, instead of a $921,000 shortfall, in an excess of 1.1 million that would have been due to Oldco.").

[156] Purchase Agreement § 2.04(a).

Braga does not dispute that transferring the Excluded AR to Newco at Closing would have resulted in a wash if the calculation of the Working Capital Adjustment operates as just described. It asserts instead that the provision was intended to operate differently in that "Aged AR was not supposed to be counted for working capital purposes."[157] In advancing this argument before and during trial, Braga did not point to any language in the Purchase Agreement that supports this interpretation or that it believed was ambiguous. Rather, Braga's interpretation relied on documents outside of the Purchase Agreement, namely (i) an investment memo it received during due diligence suggesting that "Only AR aged less than 120 days will be considered" in the working capital calculation[158] and (ii) various communications that, according to Braga, show that "every party to the deal understood at every point leading up to the September 15, 2016 email for Sellers' counsel . . . that Aged AR would not be considered for working capital purpose."[159]

Critically, the plain language of the Purchase Agreement before it was amended via the Side Letter included *all accounts receivable of Oldco* in the

---

[157] Pl.'s Post-Trial Reply Br. 16.

[158] Investment Memo at 39.

[159] Pl.'s Post-Trial Reply Br. 14-17. Some of these communications reflect that Yenni at times appeared to misunderstand how accounts receivable were to be treated under the Working Capital Adjustment provision. *See, e.g.*, JX 30 (Yenni incorrectly contending that Aged AR was excluded from the definition of "Accounts Receivable" based on Section 3.13 of the Purchase Agreement). The Purchase Agreement, however, is clear and unambiguous on this point for the reasons explained above.

calculation of the Working Capital Adjustment without any exclusion for any Aged AR of Oldco.[160]  Given that the relevant contractual provision is unambiguous, the court must apply the terms of the Purchase Agreement as written and may not rely on extrinsic evidence to vary from those terms.[161]

After trial, Braga argued for first time that "ambiguity exists with respect to how 'Current Assets' and 'Current Liabilities' are defined . . . because there are inconsistencies with respect to Oldco's accounting methods."[162]   There are two fundamental problems with this argument.  First, there is no apparent inconsistency. Both of those definitions use identical language to describe the operative accounting

---

[160] The Purchase Agreement defines (i) "Net Working Capital" to mean "Current Assets less Current Liabilities" and (ii) "Current Assets" to mean, in relevant part, Oldco's "current assets" excluding cash, certain prepaid expenses, deferred tax assets, and "receivables from any of [Oldco's] Affiliates, managers, employees, officers or members and any of their respective Affiliates."  Purchase Agreement at 1-C, 1-H.  The Side Letter removed the Excluded AR from the assets to be transferred to Newco at Closing and from the calculation of the Closing Working Capital.  *See supra* Part I.E.

[161] *Bathla v. 913 Mkt., LLC*, 200 A.3d 754, 759-60 (Del. 2018) ("The Court must interpret clear and unambiguous terms according to their ordinary meaning and in an unambiguous, integrated written contract, the Court may not use extrinsic evidence to vary or contradict the terms of that contract.") (internal quotation marks and citations omitted); *BLGH Hldgs. LLC v. enXco LFG Hldg., LLC*, 41 A.3d 410, 414 (Del. 2012) ("Where, as here, the plain language of a contract is unambiguous *i.e.,* fairly or reasonably susceptible to only one interpretation, [the court] construe[s] the contract in accordance with that plain meaning and will not resort to extrinsic evidence to determine the parties' intentions.") (citation omitted); *Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 822 (Del. 1992) ("When the language of a contract is plain and unambiguous, the intent of the parties expressed in that language is binding.").

[162] Pl.'s Post-Trial Br. 35-37.

methods.[163]  Second, any confusion over the application of Oldco's accounting methods would be a question of fact—which Braga did not raise or attempt to address at trial—and does not mean that either definition is ambiguous.  Indeed, even after trial, Braga made no effort to explain how any alleged inconsistency concerning Oldco's accounting methods would be relevant to whether to include Aged AR in the Closing Working Capital calculation.[164]

The second assumption underlying Braga's damages calculation is invalid for two reasons.  First, the alleged breach concerning the additional $267,608 of Aged AR does not flow from the contractual breach asserted in Braga's pleading, *i.e.*, that the Fund breached Section 10.10 of the Purchase Agreement by purporting to amend Exhibit H via the Side Letter to exclude assets (*i.e.*, the Excluded AR) from being transferred to Newco. This is because, unlike the Excluded AR, the $267,608 of accounts receivable that became 120 days past due between September 15 and 18

---

[163] *See* Purchase Agreement at 1-C ("Current Assets" and "Current Liabilities" are both "determined using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies that were used in the preparation of the Year End Financial Statements [of Oldco] for the most recent fiscal year end as if such accounts were being prepared and audited as of the fiscal year end.").

[164] Braga also asserts that Yenni and Feller amended the Purchase Agreement in June 2016 when Yenni "confirmed" with Feller via email that the Aged AR would be excluded from the Closing Working Capital calculation.  Post-Trial Reply Br. 14-15; *see* JX 3.  This argument is devoid of merit.  This email exchange simply shows Yenni's preferred reading of the Purchase Agreement.  Nowhere do either Yenni or Feller identify any contract language to amend.

*was transferred* to Newco at Closing.[165]  Damages that do not result from the alleged breach are not compensable.[166]  Second, even if Braga had asserted a claim for breach of the Working Capital Adjustment provision in Section 2.04 of the Purchase Agreement, the additional $267,608 of Aged AR would have been included in the calculation of the Closing Working Capital in accordance with the unambiguous language of the Purchase Agreement for the reasons discussed above.  Thus, there would have been no adjustment in Newco's favor as Braga contends.

The third assumption underlying Braga's damages calculation is that Braga had a right to receive a *pro rata* share of damages that Newco allegedly suffered. This assumption is plainly incorrect.  Under the Purchase Agreement, any accounts receivable acquired from Oldco was to be transferred to Newco at Closing[167] and, similarly, any adjustment in Newco's favor in calculating the Closing Working Capital would have redounded to the benefit of the entity.  Neither Braga nor any other member of Newco was entitled to receive a distribution from Newco in connection with the transaction in cash or any other the form.[168]

---

[165] Tr. 407 (Yenni); JX 60.

[166] *See Carlson v. Hallinan*, 925 A.2d 506, 528-29 (Del. Ch. 2006) (rejecting contract claim where plaintiffs failed to prove "that any damages resulted from the violation.").

[167] Purchase Agreement § 2.01.

[168] *See* Tr. 233-34 (Ricardo).

In its Complaint, Braga contended that its investment in Newco—which consists of an illiquid minority interest in a non-public entity—would have been "less valuable than it should have been" if the Purchase Agreement had been breached.[169] This articulation of the potential harm to Braga arising from a breach of the Purchase Agreement is logical given the structure of the transaction and the nature of Braga's investment. But Braga never introduced any evidence of the diminution in the value of *its investment*. Braga instead focused on alleged harm *to Newco*. Because Braga's calculations do not reflect its "actual damages" and because Braga provided no "principled way" for the court to determine its alleged damages (as opposed to Newco's) if either or both of his first two assumptions had been proven to be correct, Braga's analysis would have to "be put aside" for that independent reason as well.[170]

In sum, for the reasons explained above, the court finds that, even if the Fund had breached Section 10.10 of the Purchase Agreement, Braga failed to prove that it suffered any cognizable damages resulting from such a breach.

---

[169] Compl. ¶ 39.

[170] *See Ivize*, 2009 WL 1111179, at *11-12 (rejecting plaintiff's damages calculation and awarding nominal damages of one dollar even though it seemed likely that plaintiff "did suffer some damages" because its expert "simply made plaintiff-friendly calculations" that "do not reflect [plaintiff's] actual damages" and the court was not "in a position to determine the value of [plaintiff's] loss in a principled way" given "the evidence present in the record.").

Apart from the fact that each of the three assumptions underlying Braga's damages calculation are invalid for the reasons discussed above, the court finds that Newco benefited from the Side Letter in two ways. First, without the Side Letter, Newco would have had to issue a promissory note to Oldco, which would have jeopardized Newco's compliance with its loan covenants.[171] Second, as Braga acknowledges in its own damages calculation, the Side Letter saved Newco $200,000 of transaction expenses it otherwise would have been obligated to pay.[172] Thus, far from indicating that Newco was damaged by the decision to enter into the Side Letter, the record reflects that it actually benefited from doing so.

* * * * *

For the reasons explained above, the court finds that Braga failed to prove that the Fund breached the Purchase Agreement and, even if it had, that Braga suffered any damages as a result. Accordingly, judgment on Count I of the Complaint will be entered in favor of the Fund.

## B.    The Co-Investment Agreement Claim

Counts II and III of the Complaint both concern the Co-Investment Agreement, Section 4 of which provides, in its entirety, that:

> [Braga] intends to be a passive investor in Newco but shall be granted
> [Board] observer rights in which capacity it shall receive copies of all

---

[171] Tr. 399 (Yenni); JX 3 at 1; JX 30 at 1.

[172] *See* Purchase Agreement § 10.01.

Board packages prepared for Board members concurrent with receipt thereof by all Board members and shall be reimbursed all travel and related expenses in accordance with Company policy.[173]

Under Section 6 of the Co-Investment Agreement, Braga is obligated to pay the "Managing Partner" of the Fund an annual fee of $14,000, which equates to two percent of Braga's $700,000 investment in Newco, payable in quarterly installments of $3,500.[174]

Braga asserts that the Fund materially breached its "ongoing obligation to make sure [Braga's Board observer] rights are honored" under Section 4 of the Co-Investment Agreement.[175]  In terms of remedy, Braga seeks an order of specific performance and damages for the fees it paid "from the date on which Braga's Board Observer Rights were rescinded until they are truly fully restored."[176]  The Fund counters that it does not have a "continuing enforcement obligation . . . with respect to Braga's Board observer rights" under the Co-Investment Agreement, and even if it did, it "materially complied with these rights."[177]  For the reasons explained below, the court concludes that the Fund has an obligation under the Co-Investment

---

[173] Co-Investment Agreement § 4.

[174] *Id.* § 6; Ricardo Dep. 62-63.

[175] Pl.'s Post-Trial Reply Br. 19, 25.

[176] Pl.'s Post-Trial Br. 57-58.

[177] Def.'s Post-Trial Answering Br. 43.

Agreement to ensure that Braga receives its Board observer rights but that the Fund materially complied with this obligation.

According to the Fund, Section 4 of the Co-Investment Agreement does not create an ongoing obligation on the part of the Fund because it contemplates the "granting of Board observer rights to Braga" and "[s]uch rights are Newco's to grant, and Newco's management to maintain, not the Fund's."[178] Consequently, "once Newco granted Braga its Board observer rights through its executed and ratified Operating Agreement, it discharged the Fund's obligation to Braga."[179] The court disagrees.

It is correct that Newco's operating agreement as of the Closing recognizes Braga's Board observer rights, including its right to receive Board packages.[180] The plain language of Section 4 of the Co-Investment Agreement, however, creates an *independent* obligation on the Fund—as the "Managing Investor" of Newco—to ensure Braga receives the rights it secured in Section 4 in exchange for agreeing to purchase a 23.3% interest in Newco, including that Braga "*shall* be granted [Board]

---

[178] *Id.* 41-42.

[179] *Id.* 42.

[180] Amended Operating Agreement §3.01(c)(i) ("In addition, Yenni shall have the right to invite (and/or remove) up to four (4) Board observers to any and all meetings of the Board who shall be entitled to receive Board packages at the same time as Board Members. The initial Board observers so appointed are . . . and Ricardo Braga. . . ."). This language is an issue in the other lawsuit between the parties pending in this court. *See supra* Part II.

observer rights" and "*shall* receive copies of all Board packages."[181] This conclusion is further supported by the fact that (i) Braga and the Fund are the only parties to the Co-Investment Agreement; (ii) nothing in that agreement reflects that the Fund's obligations under Section 4 were intended to be discharged upon incorporating those rights into Newco's operating agreement; and (iii) it was the Fund that restored Braga's Board observer rights pursuant to the Co-Investment Agreement in February 2017—more than six months after Braga's Board observer rights had been incorporated into Newco's operating agreement.[182]

The court's next task is to determine what type of information Braga is entitled to receive under Section 4 of the Co-Investment Agreement and whether the Fund materially complied with its obligation to ensure Braga received those materials consistent with its Board observer rights. The relevant part of Section 4 provides that Braga "shall receive copies of all Board packages prepared for Board members concurrent with receipt thereof."

Braga asserts that this provision entitles it to receive a sweeping amount of information falling into three categories:

- Documents "uploaded to the Board Data Room" before Braga's rights were "rescinded" in January 2017 when Ricardo was

[181] Co-Investment Agreement § 4 (emphasis added).

[182] *See* JX 69 (February 23, 2017 letter from counsel for the Fund reinstating "all Board Observation Rights afforded to Braga Investment & Advisory . . . as set forth in Paragraph 4 of the Co-Investment Agreement.").

disinvited from attending a Board meeting,[183] including "Board Meeting Agendas, Monthly Reports regarding New Proposals, Monthly Reports of New Additional Services, Monthly Reports of Approved Additional Services, Borrowing Base Certificates, Weekly Cashflow Reports, Covenant Calculations, Lender Reports, and Weekly Sales Reports."[184]

- Any information provided to Newco's other Board observers, including "reports related to Newco's loans, especially to the extent Newco is in default; Board meeting agendas; the independent assessment report that led to the Newco's lenders insisting that Newco must retain a CRO; a letter of intent related to Newco's potential purchase of the assets of a related company; borrowing base certificates; cash forecasts sent to Newco's lenders; sales forecasts; and discussions regarding forbearance on Newco's loans."[185]

- All information "related to Newco's operations and finances, to which a Newco Board member is entitled," including "for instance, matters concerning any tax liens; forbearance agreements, including related correspondence; correspondence regarding defaults under Newco's loan agreements; information regarding Yenni's 2018 criminal conviction; assessment reports; board meeting agendas and meeting minutes; lender reports; monthly reports regarding new proposals; monthly reports of new additional services; monthly reports of approved additional services; borrowing base certificates;

---

[183] The Board meeting in question occurred on January 27, 2017. Less than one month later, on February 23, the Fund sent Braga a copy of the January 27 Board package and restored its Board observer rights. *See* JX 69. Braga does not seek relief concerning this specific incident but identifies the incident as the point when the Fund allegedly "provided Braga with less information than it had before." Pl's Post-Trial Br. 48-49.

[184] Pl.'s Post-Trial Br. 52.

[185] *Id.* 53 (citations omitted).

weekly cashflow reports; covenant calculations; weekly sales reports; and Newco's tax returns."[186]

In an effort to support its expansive interpretation of the term "Board packages," Braga asserted for the first time after trial that the term is ambiguous and requires extrinsic evidence.[187] Braga points to no parol evidence concerning the drafting of the Co-Investment Agreement. It argues instead that the term should be interpreted in accordance with the parties' "course of conduct" based on the scope of materials that were provided to Braga during a few months after the Closing, *i.e.*, from the first Board meeting in October 2016 until late January 2017.

The Fund counters that "the term 'Board package' is plain on its face" and covers a far more discrete set of information as is "commonly understood by Delaware courts."[188] According to the Fund, "the language at issue reflects no more than an intention to include Braga as part of Newco's normal distribution of its Board packages."[189] The court agrees.

"A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction."[190] Rather, "the court stands in the shoes of an

---

[186] *Id.* 56.

[187] *Id.* 49-50.

[188] Def.'s Post-Trial Answering Br. 45.

[189] *Id.* 46.

[190] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

objectively reasonable third-party observer, and ascertains whether the contract language is unmistakably clear."[191]  In doing so, the court will give the terms of a contract their "ordinary and usual meaning."[192]

The term "Board package" is not static and does not equate to an unvarying checklist of items, but that does not mean that the term does not have an ordinary and usual meaning or that it is ambiguous as used in the Co-Investment Agreement. Here, the plain language of Section 4 reflects the parties' intention to provide Braga the same set of materials that Newco management determines, in good faith, are necessary to provide to Board members in connection with a Board meeting so that they can perform their duties in an informed manner.  Delaware courts commonly refer to Board packages consistent with this definition.

In *Amalgamated Bank v. Yahoo! Inc.*, for instance, the court explained that "[t]he corporate secretary generally prepares board packages or gathers them from the applicable members of management, reviews what is gathered to ensure it is narrowly tailored to the board's purposes and disseminates the materials necessary for the board members to review in advance of each meeting of the board."[193] Similarly, in *Elow v. Express Scripts Holding Co.*, the court described "board or

---

[191] *In re IAC/InterActive Corp.*, 948 A.2d 471, 494-95 (Del. Ch. 2008) (internal quotation marks and citations omitted).

[192] *Rhone-Poulenc*, 616 A.2d at 1195.

[193] 132 A.3d 752, 790 & n.38 (Del. Ch. 2016) (internal quotation marks omitted).

committee packages" to include "agendas, minutes, or presentations" relating to board meetings.[194]  What specific presentations or other materials management decides to distribute to board members for a particular meeting will vary depending on the circumstances, of course, but the guiding principle is "to provide the board of directors with the information that the directors need to perform their statutory and fiduciary roles."[195]

Braga's proposed interpretation of the term "Board packages" and, more broadly, the intent of Section 4 of the Co-Investment Agreement is untenable. Contrary to Braga's interpretation, nothing in that provision contemplates that Braga is entitled to receive every scrap of paper that a Board member theoretically could ask to see untethered to the materials that are selected, in good faith, for inclusion in a package of materials for the Board member's review in connection with a particular Board meeting.  Rather, to repeat, Section 4 expressly provides that Braga only is entitled to receive "copies of all Board packages prepared for Board members concurrent with receipt thereof."[196]

Braga produced no evidence to support a finding that the Fund materially failed to comply with its obligation to ensure that Braga received Board packages

---

[194] 2017 WL 2352151, at *7 (Del. Ch. May 31, 2017).

[195] *Amalgamated Bank*, 132 A.3d at 781 (collecting authorities).

[196] Co-Investment Agreement § 4.

based on the ordinary and usual meaning of that term, described above.[197]  Rather, the record reflects that "Yenni and Newco invited Braga to attend all . . . Board meetings" after the January 2017 meeting and "shared with Braga the board packages that were sent to others, board members and observers."[198]  Those Board packages typically included, as would be customary, Newco's management report, Board meeting minutes and agendas, financial statements, and "any special information [for] any significant items that require board attention or board voting. . . ."[199]

* * * * *

For the reasons explained above, the court finds that Braga failed to prove that the Fund breached Section 4 of the Co-Investment Agreement and thus it is entitled to no relief thereunder.  Accordingly, judgment on Counts II and III of the Complaint will be entered in favor of the Fund.

## IV.  CONCLUSION

For the reasons explained above, judgment will be entered in favor of the Fund and against Braga on Counts I-III of the Complaint.  The Fund is entitled to costs as

---

[197] As noted above, Braga was not provided a copy of the Board package for the January 27, 2017 meeting, which was sent to him the next month.  *See supra* note 183.

[198] PTO ¶ 88; Tr. 413 (Yenni); *see also* Tr. 249 (Ricardo) ("Q.  And you've been invited to attend all board meetings.  Is that correct?  A.  That's correct.").

[199] Tr. 413-15 (Yenni).

the prevailing party on all counts.[200]  The parties are directed to confer and to submit

an implementing order consistent with this opinion within five business days.

---

[200] Ch. Ct. R. 54(d) ("[C]osts shall be allowed as of course to the prevailing party unless the Court otherwise directs.").